IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | |
|---|---|
| IN RE: § | |
| § | |
| Donald R. Triplett, Jr., § | Case No. 19-42570 |
| § | (Chapter 7) |
| Debtor. § | |
| § | |
| § | |
| Shawn Valk and Ron Valk, as Assignees § | |
| of Estate Claims of Donald R. Tripplett, Jr., § | |
| § | |
| Plaintiffs, § | |
| § | |
| v. § | Adv. Proc. No. 21-4107 |
| § | |
| Alejandro Escoffie a/k/a § | |
| Alex Escoffie, § | |
| § | |
| Defendant. § | |

## MEMORANDUM OPINION

On December 7, 2022, this Court conducted a trial on the "Complaint to Avoid and Recover Transfers Pursuant to 11 U.S.C. §§ 544 and 550" filed by Shawn and Ron Valk (collectively, the "**Plaintiffs**" or the "**Valks**"), as assignees of the claims of Donald R. Triplett, Jr.'s bankruptcy estate, against Alejandro "Alex" Escoffie (the "**Defendant**" or "**Escoffie**"). The Plaintiffs seek to establish that Triplett made 41 transfers (totaling $17,012.21) to Escoffie with constructive fraudulent intent.[1] The Court took this matter under advisement at the conclusion of the trial to allow the parties to submit written closing arguments and prepare a detailed written ruling. The Court exercises its core jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334 and

---

[1] The Plaintiffs' complaint asserted claims for actual and constructive fraud. The Plaintiffs stated at trial that they were proceeding only on their constructive fraud claim.

1

157(b)(2)(A), (H) and (O). This Memorandum Opinion embodies the Court's findings of fact and conclusions of law. *See* FED. R. BANKR. P. 7052.[2]

## RELEVANT FACTUAL BACKGROUND

### The Debtor's Relationship with Escoffie

1	Prior to bankruptcy, Donald R. Triplett (the "**Debtor**") was in the business of commercial and residential construction, remodeling, and design.

2.	The Debtor engaged in business using the name "Preferred Platinum Construction," among other business names.

3.	The Debtor is married to Jose Doniceth "Doni" Escoffie. Alejandro "Alex" Escoffie is a relative of the Debtor's husband. The Debtor has raised Escoffie since Escoffie was ten or eleven years old. The Debtor refers to Escoffie as his son or stepson.

4.	The Debtor made 41 transfers to Escoffie in the total amount of $17,012.81 from February 2016 through July 2019. The Debtor made these transfers from his personal account as well as an account he held for doing business as "Preferred Platinum Construction."

5.	The Debtor and Escoffie testified at trial.

6.	The Debtor testified that he sometimes loaned money to Escoffie. He also testified that Escoffie worked on construction projects for him and that Escoffie sometimes used his own funds to buy materials for the projects and was subsequently reimbursed by the Debtor.

7.	Escoffie testified, credibly, that he worked on various construction projects for the Debtor from February 2016 through July 2019. He did cabinetry and trim work, some plumbing, and demolition on projects for the Debtor. He testified that at the end of each week, he would

---

[2] To the extent any of the following findings of fact are construed as conclusions of law, they are hereby adopted as such. Likewise, to the extent any of the following conclusions of law are construed as findings of fact, they are hereby adopted as such.

submit hand-written invoices to the Debtor's business office as well as receipts for items he had purchased for the jobs. He testified, credibly, that he paid for some items with cash, some with his debit card, and for larger purchases, he would call the Debtor's business office to make the purchase over the phone.

8. Escoffie had no knowledge of the Debtor's financial condition or any control over the Debtor's finances.

9. The Debtor testified that it was customary for laborers and craftsmen such as Escoffie to submit handwritten invoices to his office at the end of each week so they could be paid. The Debtor testified, credibly, that he personally knew Escoffie worked on residential and construction projects for him. The Debtor identified the specific projects where Escoffie worked for all but nine of the challenged transfers. The Debtor also identified eight loans he made to Escoffie (totaling $1,948.50) and one payment of $750 for "admin work." The Debtor also testified, credibly, and with references to bank statements, that Escoffie had more than repaid the loans the Debtor made to him over the years.

10. The Debtor testified that he was "typically" able to pay his personal debts as they came due but admitted that "things got tight" on occasions when he did not receive prompt payment for his construction work.

### The Debtor's Bankruptcy Case

11. The Debtor filed a petition for relief under Chapter 7 of the Bankruptcy Code on September 19, 2019.

12. The Debtor owned a home when he filed for bankruptcy, which he valued at $225,000. The Debtor reported less than $50 in several checking accounts and no interest in any retirement or investment accounts on his petition date.

13. In his "Statement of Financial Affairs" ("**SOFA**"), the Debtor identified numerous legal actions in which he was a party in the year preceding bankruptcy. The litigation included several lawsuits by and against the Debtor, Ron Valk, Shawn Valk and the Valks' business, Platinum Construction (which is distinct from the Debtor's similarly named d/b/a, Preferred Platinum Construction). The litigation also included two lawsuits brought against the Debtor by Jeremy Haltom. In addition, the Debtor and Ron Valk's son, Shawn Valk, were engaged in litigation regarding their respective interests in TV Arrowhead, LLC ("**TV Arrowhead**").

14. The Debtor exempted his home and household items from his creditors. His primary non-exempt assets were his claims against the Valks and Valk-related entities and his interest in TV Arrowhead.

15. In his "Schedule A/B: Property," the Debtor stated that Ron Valk owed him an unknown amount of money. The Debtor described Ron Valk's alleged debt to him as follows:

> Platinum Construction Ron Valk owes debtor for multiple projects completed for him. They have liens on them. He also owes me for product he stole. As well as money for construction work completed on his personal home and office. All subject to ongoing law suits. Also owed 10% if [sic] backend profit on two commercial building sales.

16. In his "Schedule A/B: Property," the Debtor listed the following accounts receivable in the total amount of $221,061 owed to him by Ron Valk:[3]

    Ronald Valk- Platinum Construction Maple $77,000
    Ronald Valk- Platinum Construction Locus Grove $54,061.00
    Ronald Valk Personal $30,000.00
    Ronald Valk Saro LLC $60,000.00

17. In his "Schedule A/B: Property," the Debtor stated that he had a 50% interest in TV Arrowhead. The Debtor valued his interest $325,000.

---

[3] In the claim filed by Ronald Valk in this case, he states that he is seeking to recover from the Debtor with respect to the "Maple Avenue Project" and "Locus Grove Project" based on the Debtor's alleged fraud.

18. According to documents filed in the Debtor's bankruptcy case, Shawn Valk and the Debtor were managing members of TV Arrowhead, whose only asset was a lake house. A dispute arose between the Debtor and Shawn Valk regarding the allocation of capital contributions to TV Arrowhead, and Valk sued the Debtor, seeking to wind up the business in 2018.

19. The state court approved a sale of the lake house for $625,000, and the sale was set to close on September 20, 2019. The day before the closing, the Debtor filed bankruptcy.

20. Shawn Valk promptly moved for relief from the automatic stay so the sale could proceed. This Court granted the motion.[4]

21. In his "Schedule E/F: Creditors Who Have Unsecured Claims," the Debtor listed a total of $3,128,635.86 in liabilities. His undisputed debts included a priority claim for debt owed to the Internal Revenue Service ("**IRS**") in the estimated amount of $160,000. The IRS filed a proof of claim in the total amount of $173,413.61 for taxes due for tax years 2006, 2007, 2008, 2010, 2011, 2014, 2017 and 2018.

22. The Debtor's bankruptcy schedules included numerous unsecured, non-priority creditors on the petition date, including Capital One Bank, Barklay's Bank, Citibank, Colonial Bank, Cowboys Card Services, Credit One, and First National Credit Card. The Debtor listed each of their claims as undisputed.

23. The Valks filed the following claims against the Debtor in his bankruptcy case: (i) Claim No. 31-1 filed by Ron Valk d/b/a Platinum Construction as a general unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud, and (ii) Claim No. 32-1 filed by Shawn Valk d/b/a Platinum Construction as a general

---

[4] The sale of TV Arrowhead's lake house closed on September 30, 2019, and the Chapter 7 trustee received net sales proceeds of $578,000.24 to hold in escrow pending a resolution of the ownership dispute with Shawn Valk. This Court subsequently approved a compromise and settlement agreement between the Chapter 7 trustee and Shawn Valk whereby the estate received $153,708.90 of the sales proceeds.

5

unsecured claim in the sum of $591,000.00 for asserted breach of contract, breach of warranty, theft/conversion, and fraud.

24. Claim numbers 31-1 and 32-1 are identical. In their proofs of claim, the Valks detail their claims in litigation they brought against the Debtor in Texas state court in 2018. The litigation was pending when the Debtor filed for bankruptcy.

25. The Debtor's bankruptcy schedules and statements, and the claims filed in his case, show that several state court judgments were entered against him in the years leading up to bankruptcy. For example, the Debtor listed an undisputed, unsecured debt of $32,512.46 owed to Kevin Otto, which arises from a judgment entered in a lawsuit brought by Otto in 2014 according to the Debtor's SOFA. The Debtor also listed an undisputed, unsecured debt owed to Sheldon Snyder, which arises from a judgment entered in a lawsuit brought by Snyder in 2012 according to the Debtor's SOFA. Snyder filed Claim No. 39-1 against the Debtor in his bankruptcy case, which attached the state court judgment entered on October 18, 2018, in the amount of $88,217.39. And on August 19, 2019, a state court entered a final judgment against the Debtor in the principal amount of $174,926.70 in favor of Keith Black. Black filed Claim No. 34-1 in the Debtor's bankruptcy case. These judgments remained unpaid on the petition date.

26. On August 3, 2021, the Chapter 7 trustee filed a motion seeking approval of the sale of certain claims and causes of action. As described in the motion, the estate held an interest in one or more claims or causes of action that had been asserted or could have been asserted in several lawsuits that were pending on the petition date as well as potential avoidance actions.

27. Ron and Shawn Valk offered to purchase all the estate claims and rights described in the Chapter 7 trustee's motion. In consideration for the estate's sale and assignment of its claims

and rights, the Valks agreed to (i) pay the estate the sum of $50,000.00 and (ii) the subordination of the Valk proofs of claim to all allowed claims in the bankruptcy case.

28. The Debtor objected to the proposed sale. Following a hearing on August 26, 2021, the Court approved the Chapter 7 trustee's sale motion over the Debtor's objection.

29. Ron and Shawn Valk subsequently initiated this adversary proceeding seeking to avoid and recover several allegedly fraudulent transfers made by the Debtor to his putative stepson, Escoffie, in the two years prior to bankruptcy. In addition, the Valks initiated proceedings seeking to recover alleged fraudulent transfers from: (i) the Debtor's husband and his husband's business (Jose Doniceth "Doni" Escoffie and Copper Creek Distributors, Inc., Adv. Proc. No. 21-4106, for $158,807.43); (ii) the Debtor's other putative stepson (Jose Escoffie, Adv. Proc. No. 21-4108, for $6,568.85); (iii) the Debtor's business (DFW Design & Remodeling, Inc., Adv. Proc. No. 21-4109, for $25,225.90); and (iv) and the Debtor's friend and his friend's business (Darryl Briggs and Copper Creek Properties, LLC, Adv. Proc. No. 21-4110, for $9,427.84).[5]

30. The present adversary proceeding against Escoffie does not involve any of the claims asserted in the Valk proofs of claim or any of the pre-petition litigation by or against the Debtor. Rather, in this adversary proceeding, the Valks seek to establish that 41 transfers from the Debtor to his putative stepson were constructively fraudulent under the Texas Uniform Fraudulent Transfer Act ("**TUFTA**").

## DISCUSSION

1. Within a bankruptcy adversary proceeding, a trustee may avoid transfers that are avoidable under state law through 11 U.S.C. § 544(b)(1). Here, the Valks invoke § 544 to pursue

---

[5] The Court tried this matter on December 7, 2022, as noted above. The Court separately tried Adv. Proc. No. 21-4106 on October 24, 2022, Adv. Proc. Nos. 21-4106 on December 6, 2022, and Adv. Proc. No. 21-4108 on December 7, 2022. Finally, the parties settled Adv. Proc. No. 21-4110 prior to trial.

a claim to avoid transfers made with constructive intent to defraud under TUFTA §§ 24.005(a)(2) and 24.006(a). TEX. BUS. & COM. § 24.005 and 24.006.

### Proof of a "Triggering" Creditor

2. As an initial matter, Escoffie argued in his closing statement that the Valks failed to establish the existence of a "triggering" creditor necessary to invoke § 544. Section 544(a) allows a bankruptcy trustee to "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law *by a creditor holding an unsecured claim that is allowable* [.]" 11 U.S.C. § 544(b)(1) (emphasis added). Thus, the Valks can bring a fraudulent transfer action under § 544(b) only if there is a "triggering" unsecured creditor that could have brought an avoidance action under applicable state law.

3. Inasmuch as the Valks have asserted an avoidance action under TUFTA §§ 24.005(a)(2) and 24.006(a), the Valks must identify a creditor who had standing to bring the applicable TUFTA claims on the date the Debtor filed his bankruptcy petition. Section 24.006(a) differs from § 24.005(a)(2) in that it is available only to creditors whose claims arose before the transfer took place, while § 24.005(a)(2) is also available to creditors whose claims arose within a reasonable time after the transfer. This distinction is a distinction without a difference in this case because the Debtor has multiple qualifying creditors with claims that arose before the transfers.

4. The Debtor's schedules and SOFA contain numerous "triggering" creditors, who were creditors when the Debtor made the challenged transfers (from February 2016 through July 2019) and could have brought an action under TUFTA §§ 24.005(a)(2) or 24.006(a) on the Debtor's bankruptcy petition date. These creditors include Kevin Otto and Sheldon Snyder, who had filed lawsuits against the Debtor prior to any of the challenged transfers, and, notably, the IRS.

8

5.       Having established the existence of a "triggering" creditor, the Court turns to the substance of the Valks' claims seeking to establish that the Debtor transferred funds to Escoffie with the constructive intent to defraud.

### Constructive Intent to Defraud

6.       A constructively fraudulent transfer occurs without proof of actual intent when "the transferor was financially vulnerable at the time of the transaction and the 'value' exchanged was not reasonably equivalent." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 562 (Tex. 2016). The Valks assert constructively fraudulent transfer claims under two TUFTA sections: §§ 24.005(a)(2) and 24.006(a).

6.       TUFTA § 24.006(a) provides that a transfer is made with the constructive intent to defraud under the following circumstances:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE ANN. § 24.006(a). The elements of a constructively fraudulent transfer under § 24.006(a) are: (i) a transfer by the debtor; (ii) made without receiving reasonably equivalent value; (iii) when the debtor was insolvent or that caused the debtor to become insolvent; and (iv) the creditor asserting the cause of action holds a claim that arose before the transfer was made. *See id*.

7.       Similarly, TUFTA § 24.005(a)(2) provides that a transfer is made with the constructive intent to defraud as follows:

> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time

9

>   after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>   
>   ...
>
>   > (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>   >> (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>   >> (B) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

TEX. BUS. & COM. CODE ANN. § 24.005(a). The elements of a constructively fraudulent transfer under this provision are: (i) a transfer by the debtor; (ii) made without receiving reasonably equivalent value; (iii) while the debtor was engaged in or about to engage in a business for which the remaining assets of the debtor were unreasonably small or the debtor intended to incur debts beyond the debtor's ability to pay as they came due; and (iv) the creditor asserting the cause of action holds a claim that arose before or within a reasonable time after the transfer was made.

8. The elements of these two constructive fraud provisions are substantially the same. To prove that a transfer was made with constructive intent to defraud under TUFTA, the Valks must show: (i) a creditor; (ii) a debtor; (3) the creditor's claim arose before the transfer or within a reasonable period of time after the transfer; (iv) lack of reasonably equivalent value for the transfer; and (v) the transferor was financially vulnerable or insolvent at the time of the transaction. TEX. BUS. & COM. §§ 24.005(a)(2), 24.006(a); *see also Janvey* 487 S.W.3d at 566 (Tex. 2016) (discussing actual and constructive fraud under TUFTA).

9. As discussed supra, the Valks have established the existence of a creditor with standing to bring an action under TUFTA §§ 24.005(a)(2) and 24.006(a).

10. At trial, the parties disputed whether the Debtor was insolvent when he made the 41 challenged transfers to Escoffie. Under TUFTA, a debtor is insolvent if "the sum of the debtor's

10

debts is greater than all of the debtor's assets at a fair valuation." TEX. BUS. & COM. CODE. § 24.003(a). In addition, "[a] debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."!TEX. BUS. & COM. CODE. § 24.003(b).

11. TUFTA § 24.003(a) parallels the Bankruptcy Code's approach to insolvency. The Bankruptcy Code, like TUFTA § 24.003(a), defines insolvency as a "financial condition such that the sum of [the] entity's debts is greater than all of [its] property, at a fair valuation ...." 11 U.S.C.A. § 101(32). "Courts refer to this as a balance sheet test, and engage in the "fair valuation" of the debts and property shown on the debtor's balance sheet." *Sherman v. FSC Realty LLC* (*In re Brentwood Lexford Partners, LLC)*, 292 B.R. 255, 268 (Bankr. N.D. Tex. 2003) (citing *In re Lamar Haddox Contractor, Inc.,* 40 F.3d 118, 121 (5th Cir. 1994)).

12. Alternatively, to establish a presumption of insolvency under § 24.003(b), "various factors are relevant to determine whether a debtor's payment of its debts shows insolvency." *Williams v. Hous. Plants & Garden World, Inc.*, 508 B.R. 19, 30–31 (S.D. Tex. 2014) (quoting *In re Arriola Energy Corp.*, 74 B.R. 784, 790 (S.D. Tex. 1987)). "Among them are the number and amount of the unpaid debts in relation to the size of the debtor's operation; the age and number of unpaid debts; the total amount of indebtedness; and the number of unpaid creditors[.]" *Id. See also Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 387 (5th Cir. 2017) (discussing TUFTA § 24.003(b)).

13. In their closing, the Valks argued that the Debtor was insolvent when he made the challenged transfers based on the balance sheet test. The Valks drew this Court's attention to the Debtor's bank statements, his credit card statements, his SOFA, and the damages various individuals were seeking from him in lawsuits. The Valks' argument, which only includes funds in bank accounts and excludes non-cash assets such as receivables and the Debtor's interest in TV

Arrowhead, is incomplete and insufficient to meet the balance sheet test for insolvency under TUFTA § 24.003(a). However, the Valks established that the Debtor was not paying his debts as they came due and was presumptively insolvent under TUFTA § 24.003(b).

14. The Debtor's bank statements show that he moved large sums through his accounts each month.[6] The Debtor's bank and credit card statements also show that when he occasionally received large payments for construction projects, he promptly used the funds to pay personal and business debts. The Debtor, however, was accruing more debt than his income could pay. The Debtor maintained balances on numerous credit cards, and several large judgments were entered against him in the years prior to bankruptcy, which he did not pay. The Debtor failed to pay all his federal income taxes for many years prior to bankruptcy. The Debtor also was a defendant in several cases seeking, collectively, hundreds of thousands of dollars in damages against him when he filed for bankruptcy.

15. In his testimony, the Debtor referenced the large payments he occasionally received for his construction work as evidence of his solvency. However, the Debtor's testimony that he was solvent when he made each of the transfers to Escoffie was not supported by the documentary evidence.

16. The Debtor did not have sufficient income to pay all his debts as they came due during the relevant time period. He continued to pay his personal debts and operate his businesses by delaying payments to some creditors, not paying others (especially his judgment creditors), and juggling money between various accounts and entities. Thus, a presumption of insolvency arose in this case under TUFTA § 24.003(b). Escoffie failed to rebut that presumption.

---

[6] The Valks introduced into evidence several binders filled with bank and credit card statements for accounts belonging to the Debtor. Their closing statement contains an analysis of those records.

17. Nonetheless, the Debtor received reasonably equivalent value in exchange for the transfers he made to Escoffie. TUFTA defines "reasonably equivalent value" as including, "without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS. & COM. CODE § 24.004(d). Escoffie is a craftsman who installed cabinets and performed plumbing and demolition work. Like any other laborer on the Debtor's construction projects, he worked in exchange for payments, thereby allowing the Debtor to complete those projects and produce income for himself and his business. Escoffie submitted his invoices and requests for reimbursements and was paid in the same manner as all the Debtor's other workers. The Debtor also reimbursed Escoffie for materials Escoffie purchased to complete certain projects in the same manner he reimbursed other workers. And Escoffie repaid the small, occasional loans the Debtor made to him over the years.

18. The Court, therefore, concludes that the Valks failed to establish that the Debtor made the payments to Escoffie with the constructive intent to defraud under TUFTA §§ 24.005(a)(2) or 24.006(a).

## CONCLUSION

For all the foregoing reasons, the Court concludes that the Valks failed to establish that any of the challenged transfers to Escoffie were made with the constructive intent to defraud under TUFTA §§ 24.005(a)(2) or 24.006(a). The Court will enter a separate Judgment consistent with this Memorandum Opinion.

Signed on 03/31/2023

*Brenda T. Rhoades*  SD
HONORABLE BRENDA T. RHOADES,
CHIEF UNITED STATES BANKRUPTCY JUDGE